# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **GRAY YOUNGBLOOD JORDAN,** | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| **vs.** | ) | **Nos. 3:07-CR-89** |
| | ) | **3:14-CV-185** |
| **UNITED STATES OF AMERICA,** | ) | **REEVES/GUYTON** |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

## ORDER

Defendant Gray Youngblood Jordan ("Gray")[1] has filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 [Doc. 334]. The United States has responded to the motion, objecting to Gray's requested relief [Doc. 346] to which Gray has replied [Doc. 350]. The matter is now ripe for consideration.

## I. BACKGROUND

On July 18, 2007, the grand jury returned an indictment charging Gray and others with conspiring to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A), and money laundering in violation of 18 U.S.C. § 1956 [Doc. 3, *Indictment*]. On January 21, 2009, Gray and three other codefendants proceeded to trial. Following a ten-day trial, Gray was convicted as charged [Doc. 181, *Jury Verdict*]. Gray was sentenced to 180 months' imprisonment, which was below his applicable advisory Sentencing Guideline range [Doc. 296, *Judgment*; Presentence Investigation Report ["PSR"], ¶ 71]. He

---

[1] In the Sixth Circuit's opinion in this case, it referred to Petitioner as "Gray" due to the fact that Gray's brother, William Capers Jordan was also charged. To maintain consistency and reduce confusion, this Court will refer to these parties in the same manner the Sixth Circuit did. *United States v. Jordan*, 511 F. App'x 554 (6th Cir. 2013).

1

subsequently filed a direct appeal. The Sixth Circuit affirmed his conviction and sentence. *United States v. Jordan*, 511 F. App'x 554 (6th Cir. 2013). Gray timely filed this § 2255 motion [Doc. 334].

## II.    STANDARD OF REVIEW

A prisoner in federal custody may file a motion to vacate, set aside, or correct a sentence, pursuant to 28 U.S.C. § 2255 "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." The relief authorized by 28 U.S.C. § 2255 "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). Rather, a petitioner must demonstrate "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law . . . so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). He "must clear a significantly higher hurdle than would exist on direct appeal" and establish a "fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998).

The Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right extends beyond the mere presence of counsel to include "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish a claim of ineffective assistance, Gray must demonstrate two essential elements: (1) counsel's performance was deficient,

that is, below the standard of competence expected of attorneys in criminal cases; and (2) counsel's deficient performance prejudiced the defense, *i.e.* deprived the defendant of a fair criminal proceeding, rendering the outcome of the proceeding unreliable. *Id.* at 687-88.

With regard to plea proceedings, Gray must show that but for his counsel's deficient performance, he would have pled guilty if he had been given competent advice. *Griffin v. United States*, 330 F.3d 733, 738 (6th Cir. 2003). Under *Strickland*, review should be deferential and maintain a strong presumption in favor of finding counsel's conduct within the wide permissible range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

## III.  ANALYSIS

In his § 2255 motion, Gray first claims his counsel was ineffective prior to trial.  In this category of claims, he alleges the following:  (1) his counsel failed to interview key defense witnesses prior to trial, resulting in his counsel's failure to call these witnesses at trial; (2) his counsel failed to move to sever his case from the other codefendants; and (3) his counsel had a conflict of interest as he "actively covered up [] his prior association with the prosecution's primary witness," resulting in his counsel withholding "crucial evidence supporting the defense" at trial [Doc. 334, pg. 4-5].

Gray also claims his counsel was ineffective concerning plea negotiations, alleging the following:  (1) his counsel did not communicate the Government's plea offer to him, thus depriving him the option to enter into the plea agreement; and (2) his counsel advised him that he only had two options, which did not include the possibility of entering an open plea or pleading guilty without testifying against his brother, William Capers Jordan ("Capers") [Doc. 334, pg. 7].

Gray next claims his counsel was ineffective at trial in the following respects: (1) his counsel failed to object to *Brady* violations where the prosecution withheld documents pertinent

to the defense; and (2) his counsel failed to object to the dual witness role of the DEA agent as both an expert and a lay witness [Doc. 334, pg. 9].[2]

Finally, Gray alleges he received ineffective assistance of counsel at sentencing in the following respects: (1) his counsel failed to address the timing of Gray's entry into the conspiracy; and (2) his counsel failed to address adequately the issue of "reasonable foreseeability," presumably meaning the drug quantities attributable to him were not reasonably foreseeable to him [Doc. 334, pg. 10].

**A.    Ineffective Assistance of Counsel Prior to Trial**

**i.    Counsel's failure to interview potential witnesses**

First, Gray asserts that although he identified witnesses for his defense, his counsel never interviewed them. His counsel's failure to interview them resulted in them not being called at trial. These witnesses, Gray contends, would have discredited the Government's witnesses. Gray identifies the following six individuals: (1) Jody Horton, (2) Ken Severson, (3) Shirley Yarborough, (4) Eric Jennings, (5) Amy Martin, and (6) Carol Sue Young [Doc. 350, pg. 4-7]. In his reply memorandum, Gray sets forth what each of these witnesses would have allegedly testified to at trial and the way in which the testimony would have undercut the Government's case [Doc. 350, pg. 4-7].

---

[2]    Gray also contends he received ineffective assistance of counsel at trial when his counsel failed to move to sever his case from the codefendants. This is the same issue he raised regarding the performance of his counsel prior to trial. Likewise, he alleges his counsel was ineffective at trial for not impeaching the credibility of the Government's witnesses. Here he claims his counsel should have presented at trial the testimony of six witnesses he claims were not interviewed in his first category of error. The Court will deal with these two issues in addressing counsel's conduct prior to trial.

4

"In determining whether a [counsel's] performance was reasonable, [courts should] give a healthy amount of deference to counsel's tactical and litigation decisions; they are 'virtually unchallengeable' in the ordinary case." *Vasquez v. Bradshaw*, 345 F. App'x 104, 115 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 688). Although "[t]he law as developed so far has not settled on a definitive statement of what a 'reasonable investigation' entails," the Sixth Circuit has held that claims by petitioners that their attorneys failed to interview potential critical witnesses are "within the known contours of the duty." *Vasquez*, 345 F. App'x at 115. Indeed, "[a]lthough counsel need not investigate all potential witnesses, counsel is required to investigate fruitful leads that a reasonable attorney would pursue." *United States v. Arny*, 831 F.3d 725 (6th Cir. 2016) (a duty exists to "investigate all witnesses who may have information concerning his or her client's guilt or innocence" (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005))). The Court will now examine the proposed testimony of each of these witnesses.

### a. Jody Horton

Despite Gray's allegation to the contrary, his counsel actually called Jody Horton to the stand [Doc. 187, *Exhibit and Witness List for Jury Trial*]. Gray notes, however, that after a sidebar, Horton no longer testified. Gray raised this issue on direct appeal in the Sixth Circuit, which found it without merit. The Sixth Circuit explained as follows:

> Gray asserts that, during his defense, he called Joseph Horton to testify that Gray had been in a car accident in 2002, but the court excluded Horton's testimony. This testimony, according to Gray, would have shown that Gray did not participate in drug trafficking after the accident because of his health. Gray's second argument consists entirely of the following three sentences: "[O]n January 30, 2009, there was an off the record side bar. As a result of that sidebar, defense counsel for Jordan stopped putting on witnesses. Jordan submits that the sidebar chilled his right to present a defense."
>
> Turning to the first argument, we note that Horton and another witness, Nancy Jordan, testified that Gray was involved in an accident in 2002 and was hospitalized as a result. At trial, Horton stated that "in 2002 . . . Gray was driving en route to

5

> New Orleans to visit his family who was there. . . . He got in a really horrible car accident and rolled his car several times." The government objected to this testimony on the basis of relevance, and the court instructed defense counsel to ask Horton about the "time frame" instead. Nevertheless, Horton continued to testify about the accident, and the court did not exclude this testimony. Gray's mother also testified that Gray had been in an accident and was hospitalized. Accordingly, we find that Gray was not denied his right to present this defense.

*Jordan*, 511 F. App'x at 568.  In his memorandum, Gray asserts Horton would have testified that Gray was carrying "minerals and gems" for the art gallery, a legitimate business.  But, Horton actually testified that Gray transported "gems"—specifically "geodes"—and identified for whom Gray was working [Doc. 216, pg. 157-59].  Contrary to Gray's contention, Horton testified exactly to what Gray identified was crucial testimony.  Therefore, Gray's claim of ineffective assistance of counsel as it relates to Horton is without merit.

### b.    Ken Severson

Gray identifies "Ken Severson" as a crucial witness who should have been interviewed and subsequently called to testify at trial [Doc. 216, pg. 5].  Gray claims Severson would have testified that Mr. James Michael West ("Mr. West"), the professed kingpin of the marijuana conspiracy, hired him to build a fence around his 100-acre lot in Hawaii, and that Mr. West sent Gray the payment to hold until Severson completed the job satisfactorily. Gray argues this is crucial evidence because the Government presented evidence of only *one* transaction as the basis for his money laundering charge.

Gray's contention is without merit.   At trial, Joanne Baker West ("Mrs. West") testified that Gray held the property in Hawaii, that his name was on the deed, and that Mr. West and Gray had actually purchased the land with drug money [Doc. 210, *Trial Testimony of Joanne Baker West,* pg. 244].  Mrs. West also sent "drug money" to Gray whenever he asked for it [Doc. 210, pg. 247-48]. Mr. West also testified that Gray purchased the property in Hawaii for $320,000.00

6

with drug proceeds from Mr. West's drug trafficking activities, and they each agreed they would place title of the property in Gray's name only [Doc. 200, *Trial Testimony of James Michael West*, pg. 78-83, 85-87]. Mr. West sent Gray "funds both for his labor and for materials in the form of cash that I FedExed and overnighted through the U.S. Mail and also through deposits that I made to the bank account." [Doc. 200, *Trial Testimony of James Michael West,* pg. 83]. Mr. West testified "[a]ll the money I put into [the Hawaii property] was from the marijuana activities." [Doc. 200, *Trial Testimony of James Michael West,* pg. 85]. Mr. West testified that Gray had sent him an email identifying his account at Bank of America into which Mr. West deposited drug money, which would be used to develop the Hawaiian property [Doc. 200, *Trial Testimony of James Michael West,* pg. 86]. Rather than one deposit Gray contends connected him to the conspiracy, Mr. West testified that he made "several deposits," approximately "15 [or] $20,000," into a bank account Gray used for the Hawaii property, all of which were derived from marijuana sales [Doc. 200, pg. 86-87].

The District Court found that through April 2006, Gray received drug money from Joanne and Mike West for construction equipment and other expenses related to the Hawaii property. *Id.*; *see also* [PSR, ¶ 30]. His involvement was more than one transaction, just as the District Court found at sentencing [Doc. 311, pg. 28-29].

In light of the overwhelming evidence, even if Severson testified that part of the money Gray received was to pay Severson for building a fence, his testimony would not have exonerated Gray nor provided impeachment evidence. *See Fitchett v. Perry*, 644 F. App'x 485, 492 (6th Cir. 2016) (noting that defendant's proposed witnesses would not have exonerated him as neither were present during the underlying crime). As such, Gray has failed to demonstrate "a reasonable

probability that the outcome of the proceedings would have been different" had Severson testified. *See Fitchett*, 644 F. App'x at 493.

### c.     Shirley Yarborough

Next, Gray alleges his counsel should have interviewed Shirley Yarborough and called her at trial. He argues she would have testified that she lived in the "Morehouse" community in Hawaii from 2002 through 2007, and that Gray and his wife lived there with her from 2004 through 2006. Gray contends her testimony is crucial because she possesses "documents from that time period that demonstrate[] [Gray] was enrolled in a study course with Morehouse, and a video portraying [Gray] participating in that course, during a time frame when Karl Gruen falsely testified that [Gray] was transporting marijuana across the U.S. to him in Tennessee."  [Doc. 350, pg. 6].

Ms. Yarborough's testimony does not contradict Karl Gruen's.[3]   At trial, Gruen testified that he worked in a mine in Arizona for nine months in late 2000 and early 2001 for Mr. West, who paid him with drug money [Doc. 212, pg. 71-73].  Gruen testified that he knew Gray, and that Gray was responsible for operating Mr. West's marijuana stash house in Arizona [Doc. 212, pg. 73].  Gruen testified that in 2001, he assisted Gray in unloading "a few bales" of marijuana, each weighed approximately 20 pounds [Doc. 212, pg. 74, 92].  He further testified that he saw Gray with his van at a different stash house sometime in late 2004 and early 2005, delivering between five and ten bales of marijuana [Doc. 212, pg. 78-79].  He also said Gray assisted him in concealing the basement of that particular stash house in order to hide the marijuana more easily [Doc. 212, pg. 78].

---

[3]     Gruen was indicted separately and pleaded guilty to conspiring to distribute marijuana and money laundering [Doc. 212, pg. 67]; see *United States v. Gruen,* No. 3:07-CR-46 (E.D.TN).

8

While Gray does not provide the timeframe for when this alleged video was taken, even if he had, it would not have any effect on the resolution of this issue. Even if he were enrolled in a study course at some point while in Hawaii, that would not have prevented him from traveling to the continental United States. In fact, Gray alleges he also lived in Atlanta, Georgia, from 2004 through 2006, the same time the purported video would have shown him in Hawaii [Doc. 350, pg. 6-7]. Gray's own allegations reveal he was in the continental United States during the time Gruen testified he saw and helped Gray deliver marijuana. Yarborough corroborates Gruen's testimony, not contradicts it. Even assuming *arguendo* that Yarborough would have testified that Gray had enrolled in a class at some point between 2004 and 2006 in Hawaii, that does not impeach or contradict Gruen's testimony in any substantive way nor does it exonerate Gray. *See Fitchett*, 644 F. App'x at 492; *Vasquez*, 345 F. App'x at 119. This issue is without merit.

### d.    Eric Jennings

Gray identifies Eric Jennings as a witness whom his counsel should have interviewed and called to testify at trial. He asserts Jennings would testify that he employed Gray as a yoga teacher in Atlanta from 2003 through 2004, which he asserts is contrary the testimony of Karl Gruen, Ms. Deborah Nomenson, Mr. West, and Mrs. West for that same time period.

In this instance, Gray provides only a generalized allegation as to what actual testimony and evidence he seeks to contradict or impeach. This alone constitutes a basis for dismissal of his claim. *See Jefferson v. United States*, 730 F.3d 537, 548 (6th Cir. 2013) ("conclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255"). Even when considering the substance of Gray's allegations, they are meritless. For instance, Gruen testified that he saw Gray transporting marijuana in 2001 and then either in late 2004 or early 2005. Jennings' testimony that he employed Gray as a yoga instructor in 2003 and 2004 does not refute

Gruen's testimony that Gray transported marijuana in 2001 nor does it contradict his testimony that he witnessed Gray transport marijuana in late 2004 or early 2005. Neither does Jennings' testimony contradict that of Mr. West, Mrs. West, and Ms. Deborah Nomenson, all of whom testified specifically about Gray's involvement in the trafficking of marijuana and money laundering, that Gray taught yoga on the side in Atlanta some time in 2003 and 2004 does not exonerate him in the least. The testimony does not contradict the overwhelming evidence that Gray not only sold marijuana, but also helped Mr. West launder hundreds of thousands of dollars of drug money. This issue is also without merit. *See Fitchett*, 644 F. App'x at 493.

### e.     Amy Martin

Gray next asserts Amy Martin, an employee at Mr. West's art gallery in Atlanta, Georgia, called the Sensua Gallery, was a key defense witness, who was not interviewed, nor called at trial. He claims she would have testified that Gray lived with her for a portion of 2002 through 2006. He also claims she would have testified that the Sensua Gallery was a legitimate business, regardless of what Mr. West's motives were [Doc. 350, pg. 6-7]. He also claims she had a video of an auction at the Gallery that showed Gray working there. Gray claims his counsel did not introduce this video because it also showed Mr. Mark Sallee, counsel of William Capers Jordan, his brother and codefendant, bidding on pieces of artwork.[4]  *Id.*

The mere fact that the gallery engaged in a legitimate business does not mean it was not a front for money laundering and/or drug trafficking. Indeed, numerous members of the conspiracy testified that the gallery engaged in legitimate business, but the investment supporting the gallery was drug money [*See* Doc. 200, *Testimony of James Michael West*, p. 17, 19]. If Gray worked in

---

[4]     Gray raises this same issue in claiming his counsel had conflict of interest in deciding not to use this video. The Court addresses this issue when addressing the conflict of interest question, *infra.*

a legitimate capacity at the gallery, this is not evidence that he did not also engage in money laundering and marijuana trafficking, nor does it impeach the testimony of any of his co-conspirators. Gray has failed to provide any actual evidence that would exonerate him or even contradict the testimony of his coconspirators.[5] This issue is without merit. *See Fitchett*, 644 F. App'x at 493.

### f. Carol Sue Young

Finally, Gray asserts his counsel should have interviewed Carol Sue Young and called her to testify at trial. He avers she would have testified that she lived in the same community as Ms. Amy Martin in Atlanta from 2002 through 2006, and "possessed firsthand knowledge of the legitimacy of Sensua Gallery and Gray's employment there." [Doc. 350, pg. 7].

In this instance, Gray proposes Young's testimony to corroborate Ms. Amy Martin's testimony. As discussed with Ms. Martin's testimony, Gray has failed to show a reasonable probability that the trial would have been different had Ms. Martin testified. All of the same concerns the Court expressed regarding Ms. Martin's testimony apply equally to Ms. Young's proffered testimony. Gray does not provide any additional, independent reason why Ms. Young's testimony would have been useful at trial apart from corroborating testimony that would not have made any difference. Thus, he has not demonstrated "a reasonable probability that the outcome of the proceedings would have been different had his counsel introduced" the testimony of Ms. Carol Young. *See Fitchett*, 644 F. App'x at 493.

---

[5] The Court also notes an important and telling inconsistency in Gray's theory. As discussed, Gray claimed he lived in Hawaii with Yarborough from 2004 through 2006. Now, he asserts Ms. Amy Martin would testify he lived with her in Atlanta from 2002 through 2006. If Gray were dividing his time between Hawaii and Atlanta, this fact would undercut his allegation that he was not traveling to and from the continental United States during these years. Yet that was his point in using Yarborough's testimony. Once again, Gray's argument collapses in on itself.

11

### ii. Counsel's failure to move for a severance

Next, Gray alleges his counsel failed to move for a severance from his codefendants despite his repeated requests [Doc. 334, pg. 4, 8]; [Doc. 350, pg. 7-8]. Gray was tried alongside William Capers Jordan, Melvin Skinner, and Samuel Skinner. He claims joining his trial with those prejudiced him. He alleges law enforcement obtained evidence when they arrested Melvin Skinner and Samuel Skinner that linked Mr. West to the drug distribution conspiracy. Gray argues that without this evidence, the records of the calls between him and Mr. West would have been useless to the prosecution, rendering it unlikely the jury would have convicted him.

Federal Rule of Criminal Procedure 8(b) provides that an "indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." In the underlying case, the grand jury indicted Gray, Julia Newman, Sherry Farmer, Capers, Melvin Skinner, and Samuel Skinner [Doc. 3]. The indictment charges all with conspiracy to distribute marijuana and launder money. Gray does not allege there were any irregularities in the indictment. Rather, he simply alleges the Court should have severed his case from the others.

"Generally, persons indicted together should be tried together." *United States v. Dhaliwal*, 464 F. App'x 498, 509 (6th Cir. 2012) (quoting *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)). Severance should occur "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see Dhaliwal*, 464 F. App'x at 509. "Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "Merely because inflammatory evidence is admitted against one defendant, not directly involving another

codefendant . . . does not, in and of itself, show substantial prejudice in the latter's trial." *Lopez*, 309 F.3d at 971 (quoting *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985)).

Gray has failed to point to how a joint trial compromised any "specific trial right." *Zafiro*, 506 U.S. at 539. The evidence obtained after the arrest of Melvin Skinner that Gray claims is overly prejudicial appears to relate to how he and Mr. West were both tied to the conspiracy. Even if the Court had severed Gray's case from the Skinners, the evidence still would have been relevant to establish Gray's involvement in the conspiracy. Simply because evidence is damaging to the defense does not render it unfairly prejudicial. *See United States v. Winkle*, 477 F.3d 407, 417 (6th Cir. 2007) ("Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). Accordingly, the Court finds this claim is without merit.

### iii. Counsel's conflict of interest and cover-up

Gray also asserts his counsel was ineffective because he was "aware of — and actively covered up — his prior association with the prosecution's primary witness. As a result, crucial evidence supporting the defense was withheld by defense counsel at trial." [Doc. 334, pg. 6]. In his supporting memorandum, Gray clarifies it was actually Capers' counsel, Mr. Mark Sallee, who had the alleged conflict of interest. Namely, he contends Mr. Sallee had a prior business association with the Government's primary witness, Mr. West. Gray claims a video taken at Mr. West's art gallery shows Mr. Sallee bidding on pieces of artwork, but his counsel decided against introducing the video at trial so Mr. Sallee could conceal this relationship [Doc. 340, pg. 21]. He claims his counsel "colluded" with Mr. Sallee to conceal this conflict of interest to his detriment

13

because the video would have demonstrated that this gallery was not a front for money laundering or drug trafficking, and that Gray worked there in a legitimate capacity [*Id.*; Doc. 350, pg. 10].

The Court notes that Capers, Gray's brother and codefendant, has also raised this same issue in his 2255 motion in which Gray has filed an affidavit [Doc. 358, pg. 9-10]. There, Gray claims the video shows Mr. Sallee bidding on artwork at the auction [Doc. 358, pg. 9]. He does not allege Mr. Sallee is socializing with Mr. West, speaking with Mr. West, or having any contact with Mr. West. Gray does not allege Mr. West is even in the video at all. However, he says the video proves the art gallery was a legitimate business and not a front for narcotics trafficking as alleged by the United States.

As an initial matter, whether Mr. Sallee had a conflict of interest does not pertain to Gray at all. Mr. Sallee represented Capers, not Gray. Gray's attorney did not have a conflict of interest at all and certainly not because Mr. Sallee bid on artwork from Mr. West's gallery. Second, it does not appear to the Court that Mr. Sallee had a conflict of interest either because of his participation in the art auction. Mr. Sallee and Mr. West were not business partners nor did Mr. Sallee ever represent Mr. West. At no point was Mr. Sallee "burdened by any ethical obligation" to Mr. West, and he could not have been "hampered in his representation" of Capers because of his bidding on art at the gallery. *See McNeal v. United States*, 17 F. App'x 258, 263 (6th Cir. 2001).

Even if Mr. Sallee's bidding on artwork created a conflict for Mr. Sallee, it certainly did not prejudice Gray at all. Prejudice is only presumed when "a conflict of interest actually affected the adequacy of [the attorney's] representation." *United States v. Kilpatrick*, 798 F.3d 365, 376 (6th Cir.), *cert. denied sub nom. Ferguson v. United States*, 136 S. Ct. 700, 193 L. Ed. 2d 522 (2015), and *cert. denied*, 136 S. Ct. 2507, 195 L. Ed. 2d 845 (2016). Gray cannot show any prejudice in his counsel's decision not to use the video because the video would not have had any

14

impact on the result of the trial. Indeed, the evidence against Gray was overwhelming and involved specific deliveries of marijuana and specific acts of money laundering. That he delivered marijuana and funneled money to the Hawaii property had nothing to do with Gray working at the art gallery. The Sixth Circuit found the evidence sufficient to convict Gray of the conspiracies, and the evidence did not involve his connection to the art gallery at all. *See Jordan*, 511 F. App'x at 559-60, 565-66.

### B. Ineffective Assistance of Counsel During Plea Negotiations

#### i. Plea Agreement

Gray alleges his counsel was ineffective because although the prosecution offered a plea agreement, his counsel never presented the offer to him. This failure deprived him of the option to enter into an agreement with the Government, which likely would have resulted in a shorter sentence. He asserts his counsel's failure to show him the prosecution's plea offer violates the principles established in *Lafler v. Cooper*, 566 U.S. 156 (2012).

Gray maintains the proffered plea agreement would have allowed him to receive a reduction for his acceptance of responsibility. Gray asserts had his counsel presented him the plea agreement, he would have pled guilty in order to receive a lesser sentence. Finally, in his reply, Gray notes that although he still disputes the drug quantity for which he is being held accountable, plenty of defendants enter into plea agreements simply to limit their sentencing exposure regardless of how they view the merits of the underlying charges.

The Government's proposed plea agreement in this case was contingent upon Gray testifying "competently and truthfully before a federal grand jury, at any trial, or at any other proceeding if called upon by the United States to do so." [Doc. 340-1, pg. 6]. It is clear from Gray's own pleadings that (1) his counsel advised him of the substance of the Government's offer,

15

and (2) he would not agree to testify against his brother [Doc. 340, pg. 12] ("Petitioner was not willing to testify against his brother, however, he was willing to accept his own responsibility and plea guilty to his offense committed").  Because Gray claimed his counsel advised he could plead if he would agree to cooperate, he concedes he knew the substance of the Government's offer. As cooperation was a part of the plea offer, Gray's refusal to cooperate undercuts his contention that he would have accepted the plea.

Although he claims his counsel was deficient for failing to negotiate a plea agreement that was not contingent on his cooperation with the Government, Gray has "no constitutional right for [such] a plea bargain." *Lafler*, 566 U.S. at 180.  Thus, his counsel's failure to obtain a plea agreement Gray found acceptable is not deficient performance.

### ii.        Open Plea

Gray contends his counsel advised him that he only had two options: plead guilty and testify against his brother, or proceed to trial.  He claims his counsel failed to inform him about the possibility of pleading guilty to the indictment without a plea agreement, or what is called "an open plea."   Indeed, Gray asserts he was "willing to accept his own responsibility and plea guilty to his offense committed."  [Doc. 340, pg. 11].  If he had  known he could plead guilty to the indictment, he would have done so.  He claims prejudice because had he entered an open plea "there is a high probability that [he] would have been sentenced to the mandatory minimum of 10 years (120 months)" and not the 15 years he received [Doc. 340, pg. 15].

In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court held the *Strickland* test applies to advice given by counsel in the context of guilty plea discussions. *See id.* at 58. The Court also held that the prejudice prong in the context of the plea process "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* To establish

16

prejudice under such circumstances, the petitioner must show he would have likely received a lesser sentence. *Missouri v. Frye*, 566 U.S. 133, 147 (2012) (accused must demonstrate a reasonable probability that the end result of the criminal process would have been more favorable).

Gray cannot show a reasonable probability that he would have received a lesser sentence. The PSR determined Gray was responsible for distributing between 3,000, but less than 10,000, kilograms of marijuana, which translates to a base offense level of 34 [PSR, ¶ 37]. Because Gray was also a manager or supervisor (but not an organizer or leader) in the conspiracy, his offense level was increased by three levels. *See* U.S.S.G. § 3B1.1(b); [PSR, ¶ 40, 46]. Finally, because Gray was convicted for money laundering under 18 U.S.C. § 1956, his offense level was increased by another two levels. *See* U.S.S.G. § 2S1.1(b)(2)(B); [PSR, ¶ 44]. This resulted in an offense level of 39 with an advisory guideline range of 262-327 months.

Gray claims he "does not deny his involvement in the marijuana conspiracy. . . . The goal was to minimize the quantity of marijuana for which he would be held accountable." [Doc. 340, pg. 16]. Gray forgets he was charged with both a conspiracy to distribute marijuana *and* money laundering [Doc. 3]. The District Court was well aware that Mr. West testified that Gray left the marijuana conspiracy in 2002, but it found Gray did not leave the money laundering conspiracy until much later [Doc. 311, pg. 28-29]. In fact, the base offense level for money laundering is the "base offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). Thus, limiting his involvement in the marijuana conspiracy avails Gray nothing, unless he also withdrew from the money laundering conspiracy as well. He did not, nor does he claim he did. The District Court properly determined his offense level based on both his involvement in the marijuana conspiracy *and* the money laundering conspiracy [Doc. 311, pg. 30-31].

At sentencing, Gray challenged both the guideline enhancement for his role in the offense and the quantity of marijuana the PSR attributed to him [Doc. 311, pg. 6-11, 13]. The Court addressed his role in the offense as follows:

> The testimony at trial showed that the defendant became involved in the conspiracy in the late 1990s. He coordinated loads of marijuana being shipped, stashed and packaged for transportation from Arizona to the Eastern District of Tennessee and elsewhere. This involvement continued until approximately 2002, 2003 when he left Arizona and moved to Hawaii as part owner of property with Mike West.
>
> The Hawaii property was purchased with drug funds and was improved and maintained by the defendant with money sent by Mike West regularly through at least April 2006. Accordingly, the Court finds the Presentence Investigation Report accurately describes defendant's involvement in the conspiracy and his objection is overruled.

[Doc. 311, pg. 28-29]. The Court overruled Gray's objections to the PSR applying the three level enhancement for being a manager/supervisor. It held that "[t]he testimony presented at trial showed defendant's role was integral to the operation of both the money laundering and drug conspiracies and that he was a manager/supervisor, directing the activities of others." [Doc. 311, pg. 31].

The Court also overruled Gray's objection to the quantity of marijuana attributed to him in the PSR. The Court meticulously calculated the marijuana attributable to Gray based on the evidence at trial, finding Gray participated in both the marijuana and money laundering conspiracies [Doc. 31, pg. 28-29]. After considering Gray's involvement in both conspiracies, the court found Gray responsible for 8,260.50 kilograms of marijuana [Doc. 311, pg. 30-31]. This was also consistent with the findings of the PSR.

18

Had Gray pled guilty to the indictment without the benefit of a plea agreement, his offense level before acceptance of responsibility would be level 39.[6] Pleading guilty would not have affected the three level enhancement for his role in the offense nor would it have affected the two level increase for pleading guilty to money laundering. *See* U.S.S.G. §§ 3B1.1(b) (role in the offense adjustment) *and* 2S1.1(b)(2)(B) (money laundering enhancement). The only change would have been the three level reduction for acceptance of responsibility, which in this case, would have reduced his offense level to level 36, resulting in an advisory guideline range of 188-235 months.

In this case, the Court granted Gray's motion for a downward departure in sentencing him to 180 months, finding as follows:

> [A] downward departure is warranted considering the defendant's criminal history, the length of time spent from the jury verdict to the date of sentencing, the fact that the defendant voluntarily withdrew from the marijuana portion of the distribution conspiracy and primarily because the disparity between the sentences of the principal leaders of the conspiracy and those with lesser positions within the conspiracy.

> The Court is fully aware that the principal defendant has pled guilty and cooperated with the government but, that does not, in the Court's mind, justify the disparities between the sentences given to those defendants who pled guilty and those defendants who availed themselves of their constitutional right to go to trial. Accordingly, the Court grants a departure under sentencing guideline 5K2.0(a)(2).

[Doc. 311, pg. 72-73]. This 180-month sentence was *less* than what Gray would have faced had he pled guilty to the indictment without a plea agreement. Moreover, it is not likely the Court would have sentenced Gray to anything less than 180 months given the reasons the District Court articulated for the sentence imposed. "The Supreme Court has held that prejudice is present where

---

[6]  Gray's base offense level would still be 34 plus three levels for his role in the offense and two levels for pleading guilty to a money laundering charge. *See* U.S.S.G. §§ 3B1.1(b) and 2S1.1(b)(2)(B).

counsel error results in an *increase* in defendant's sentence." *United States v. Allen*, 53 F. App'x

367, 376 (6th Cir. 2002) (citing *Glover v. United States*, 531 U.S. 198, 203 (2001)) (emphasis

added). In this case, Gray cannot show that any error in his counsel's advice resulted in an increase

in his sentence. Thus, this issue is without merit.

### C. Ineffective Assistance of Counsel at Trial

#### i. Counsel's failure to object to *Brady* violations

Gray asserts his counsel failed to object to the Government withholding exculpatory

evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). He claims he informed his

counsel that the Government had "[t]aped conversations of [him] and government witnesses …

withheld from discovery." [Doc. 340, pg. 19]. He claims the "tape recordings would have allowed

an opportunity to repudiate damaging testimony." [Doc. 340, pg. 19].

Gray does not identify the substance of the conversations he alleges the Government

withheld and how that would have affected this case. He merely asserts conclusory allegations.

*See Jefferson*, 730 F.3d at 548 ("conclusory allegations alone, without supporting factual

averments, are insufficient to state a valid claim under § 2255"). Gray "must set forth facts which

entitle him to relief. Conclusions, not substantiated by allegations of fact with some probability

of verity, are not sufficient to warrant a hearing" or relief. *O'Malley v. United States*, 285 F.2d

733, 735 (6th Cir. 1961); *see Foster v. United States*, Nos. 2:09-CR-5-JRG-1, 2:15-CV-227-JRG,

2017 WL 2380236 (E.D. Tenn. May 31, 2017) (citing *O'Malley*). As Gray failed to provide any

specific allegations of fact, he has left the Court to speculate as to his claim. This claim is without

merit.

20

### ii. Counsel's failure to object to the dual witness role of the DEA agent

Gray claims his counsel was ineffective for failing to object to Agent David Lewis of the Drug Enforcement Agency ["DEA"] testifying as both an expert and a fact witness. He contends the lack of both effective curative instructions and a clear demarcation between his testimony as an "expert" witness and as a "fact" witness permitted prejudicial statements to reach the jury uncontested and without the proper admonition from the court [Doc. 340, pg. 19].

The Sixth Circuit addressed this issue in Gray's case on appeal. *Jordan*, 511 F. App'x at 567-68. It held that "[a] witness may testify as a fact witness and an expert witness if there is a cautionary jury instruction regarding the witness's dual roles or a clear demarcation between the fact and expert testimony." *Jordan*, 511 F. App'x at 567. The Sixth Circuit found that "the [trial] transcript demonstrates that [the agent's] fact testimony was clearly demarcated from his opinion testimony. *Jordan*, 511 F. App'x at 568. It also noted that the District Court gave an appropriate cautionary instruction on weighing expert testimony. Accordingly, it found that "the district court did not plainly err by not giving a contemporaneous dual-role limiting instruction." *Jordan*, 511 F. App'x at 568. Even if counsel erred in not objecting to the agent's testimony in this regard, Gray cannot show any prejudice.

Gray has not presented an appropriate basis for the Court to revisit this issue. *See Holmes*, 281 F. App'x at 479 n.3 (absent highly exceptional circumstances, "[a] § 2255 motion may not be used to relitigate an issue that was raised on appeal" (quoting *DuPont*, 76 F.3d at 110 (6th Cir. 1996))). Accordingly, the Court finds this claim is without merit.

### D. Ineffective Assistance of Counsel at Sentencing

Finally, Gray alleges his counsel was ineffective for failing to address the timing of Gray's entry into the conspiracy and for failing to address "reasonable foreseeability," that is, the quantity

of marijuana reasonably foreseeable and therefore accountable to him. Both of these issues relate to the quantity of marijuana attributable to Gray as a result of his participation in both the marijuana and money laundering conspiracies.

Despite Gray's claims, the record reflects his counsel did object to the drug quantity attributable to Gray [Doc. 311, pg. 11-13]. His counsel, after providing the Court with a detailed analysis, concluded, "Therefore, those quantity amounts fall within the 1,000 to 3,000 kilo range, and . . . he should be held responsible for no more than that." *Id.* at 13. As already noted, the District Court made specific findings as to the quantity of marijuana attributable to Gray. It overruled Gray's objection and found Gray responsible for 8,260.50 kilograms of marijuana [Doc. 311, pg. 30-31]. Gray appealed that to the Sixth Circuit, which affirmed the sentence. *Jordan*, 511 F. App'x at 570-571.

As his counsel addressed these issues during the sentencing phase, Gray's allegations are without merit. The Court declines to relitigate this issue. *See Holmes v. United States*, 281 F. App'x 475, 479 n.3 (6th Cir. 2008).

## IV.    CONCLUSION

The Court finds Gray has failed to demonstrate that he is entitled to relief under § 2255 and his motion to vacate, set aside or correct the sentence [Doc. 332] will be DENIED. This action will be DISMISSED.

The Court now must consider whether to issue a certificate of appealability (COA) should Gray file a notice of appeal, since he may not appeal a final order in a § 2255 case to the Sixth Circuit unless "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). Issuance of a COA depends on whether Gray has made a substantial showing of the

Case 3:07-cr-00089-TAV-HBG    Document 363    Filed 07/20/17    Page 22 of 23
PageID #: 4089

denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

The Court will CERTIFY that any appeal from this action would not be taken in good faith and would be totally frivolous. Therefore, this Court will DENY Gray leave to proceed *in forma pauperis* on appeal. *See* Rule 24 of the Federal Rules of Appellate Procedure. Because Gray has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability SHALL NOT ISSUE. 28 U.S.C. § 2253; Rule 22(b) of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

_____
**UNITED STATES DISTRICT JUDGE**